IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

ANDREW C. SCOLLEY,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )    Case No.
                                      )    12-5108-CV-SW-REL-SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Andrew Scolley seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in evaluating the severity of plaintiff's alleged learning disability at step two of the sequential analysis and in failing to order a consultative examination before determining plaintiff's residual functional capacity.  I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.*   *BACKGROUND*

Plaintiff received SSI benefits for an anxiety disorder beginning when he was a child and continuing to 2005 when he was 25.  In October 2005, plaintiff's condition was deemed improved and his period of disability ended.  He then worked as a shipping

worker, sanitation worker and tire technician until November 6, 2009, when he was 30 years of age and claimed that he could no longer work.  On March 24, 2010, plaintiff applied for disability benefits again.  In his application he alleged that his disability stems from posttraumatic stress disorder, bipolar disorder, schizoaffective disorder and slipped discs in his back.  His application does not mention a learning disorder.  Plaintiff's application was denied on June 4, 2010.  On September 27, 2010, a hearing was held before an Administrative Law Judge.  On April 11, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On August 30, 2012, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision

is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not

less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the
plaintiff establishes that he is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that
the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857
(8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo.
2000).

The Social Security Administration has promulgated detailed
regulations setting out a sequential evaluation process to
determine whether a claimant is disabled.  These regulations are
codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step
sequential evaluation process used by the Commissioner is
outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.   Is the claimant performing substantial gainful
activity?

                Yes = not disabled.
                No = go to next step.

    2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits his ability
to do basic work activities?

                No = not disabled.
                Yes = go to next step.

    3.   Does the impairment meet or equal a listed impairment
in Appendix 1?

                Yes = disabled.
                No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Steven Benjamin, in addition to documentary evidence admitted at the hearing.

### A.    *SUMMARY OF TESTIMONY*

During the September 27, 2010, hearing, plaintiff testified; and on December 15, 2010, a vocational expert testified through interrogatories at the request of the ALJ.

### 1.    **Plaintiff's testimony.**

Plaintiff was 30 at the time of the administrative hearing and is currently 34 years of age (Tr. at 35). On his alleged onset date, plaintiff got into a fight with the nephew of the owner of Grand Tire where plaintiff was working (Tr. at 35). Plaintiff's job was to install tires and he had been working there for six months to a year at the time (Tr. at 35). The argument was over the owner's son having pulled a knife on plaintiff when he was minding his own business (Tr. at 35–36).

Plaintiff was fired and did not look for other work afterwards because he was "too irritated" (Tr. at 36).

Several months after he was fired, plaintiff was hospitalized for suicidal thoughts (Tr. at 36). He had been using marijuana prior to that once or twice a month which was typical for him at the time (Tr. at 36). He last used marijuana before he was hospitalized (Tr. at 36, 47). Plaintiff used methamphetamine until "two and a half years ago," or approximately early 2008 (Tr. at 37). Plaintiff last consumed alcohol at the time of his hospitalization (Tr. at 37, 47).

After he was released from the hospital, he was covered by Medicaid; however, he only saw Dr. Shah twice, and there was no reason why he was not able to see him more (Tr. at 37, 45). He ran out of his medications a couple days before he went to see Dr. Shah for the first time (Tr. at 48).

Plaintiff has a driver's license (Tr. at 37–38). He drives about 20 miles to the store, but his friends drive him to doctor appointments (Tr. at 38–39). Plaintiff's roommates drove him to the hearing (Tr. at 39). He lives in a house with two other people (Tr. at 39). They have five dogs and a cat (Tr. at 39). Plaintiff washes dishes and takes care of the animals (Tr. at 40). Plaintiff pays his rent by doing chores; he has no money (Tr. at 41). He did not buy his marijuana, friends gave it to him when he was out with them (Tr. at 41).

Plaintiff watches television all day (Tr. at 40). Although there is a computer in the house and plaintiff knows how to use it, he doesn't (Tr. at 40). Plaintiff has a high school education (Tr. at 40-41). Plaintiff took some of his classes with the other students but was in special education and got help with his studies in some classes (Tr. at 41).

Plaintiff is currently taking medication for depression and voices in his head (Tr. at 41-42). The medication has lessened the voices but he still hears them once a day (Tr. at 42). The voices tell him to hurt himself (Tr. at 42). His medication makes him tired (Tr. at 42). He falls asleep once a day for several hours (Tr. at 45). Plaintiff needs his roommates to help him remember things like doctor appointments (Tr. at 46). He cannot think of any other symptoms that would affect his ability to work (Tr. at 47).

Plaintiff started receiving disability benefits when he was 12 or 13 (Tr. at 42). In 2005 his sister did not send him the paperwork he needed so he lost his benefits for failure to follow up on a request for information (Tr. at 43). Plaintiff does not know why he got disability benefits when he was a teenager (Tr. at 43). He has no impairments that affect his ability to walk, stand, sit, or lift (Tr. at 43). When asked to name the number one symptom that prevents him from working, plaintiff said, "Being around other people." (Tr. at 43). He said that meant

having to work shoulder-to-shoulder with them (Tr. at 43). If he had a job where there were other people he could see but he had his own work station and worked at his own pace, he would be too distracted to perform the work because he would know other people are around (Tr. at 43-44). If he could not see them, he probably would have no problem (Tr. at 44). He would not want to work around the public because them watching him would bother him (Tr. at 44).

Plaintiff has good days and bad days (Tr. at 46). On a good day, he does not hear voices and he is able to get up and do things (Tr. at 46). On a bad day he hears voices and is depressed and anxious (Tr. at 46). He has a bad day once or twice a week (Tr. at 46). When asked what he gets anxious about, he said that doing "certain chores" (Tr. at 47).

## 2. **Vocational expert testimony.**

Vocational expert Steven Benjamin testified through interrogatories at the request of the Administrative Law Judge (Tr. at 226-233). He was asked to assume an individual with a high school education and the ability to communicate in English, the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively

few work place changes; he is limited to occasional interaction
with supervisors and coworkers; and must avoid all interaction
with the general public (Tr. at 228).  The vocational expert
stated that such a person could perform plaintiff's past relevant
work as a machine cleaner and construction worker (Tr. at 232).
The person could also perform the unskilled jobs of cleaner, with
44,190 in Missouri and 2,145,320 in the country; marker, with
30,400 in Missouri and 1,864,410 in the country, and document
preparer, with 89,260 in Missouri and 2,815,240 in the country
(Tr. at 232-233).

## B.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following
income from 1995 through 2010:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1995 | $  698.07 | 2003 | $2,535.82 |
| 1996 | 597.12 | 2004 | 0.00 |
| 1997 | 996.92 | 2005 | 0.00 |
| 1998 | 155.30 | 2006 | 16,079.84 |
| 1999 | 452.70 | 2007 | 20,140.37 |
| 2000 | 4,309.59 | 2008 | 10,831.54 |
| 2001 | 5,359.50 | 2009 | 17,635.40 |
| 2002 | 3,140.94 | 2010 | 0.00 |

(Tr. at 123).  Plaintiff was receiving disability benefits
through the end of 2005.

**Function Report**

In a Function Report received by Disability Determinations
on April 13, 2010,[1] plaintiff reported that his day starts with
smoking a cigarette and having four cups of coffee (Tr. at 140–
147).  He lets the chickens out and feeds them, has breakfast,
checks for eggs, washes dishes, watches television, gets the
mail, checks for eggs again, eats lunch, watches television, mows
the lawn, watches more television, checks for eggs a third time,
puts the chickens up for the night, eats supper, and then goes to
bed.  He did not indicate that he sleeps at all during the day
much less for several hours per day.  He was unable to list
anything that he was able to do before his alleged onset date
that he can no longer do (Tr. at 141).

Plaintiff is able to care for his personal needs.  He needs
no special reminders.  His roommate does all the cooking.
Plaintiff washes dishes, mows the lawn, and shovels snow.  He
does not need any help or encouragement to do these things.  He
goes out 8 to 10 times per day either by driving a car, riding a
bicycle, or walking, and he is able to go out alone (Tr. at 143).
He is able to shop in stores for 10 or 15 minutes per day.  He is

---

[1]Plaintiff provided the same answers on an identical form
dated April 28, 2010 (Tr. at 165–172).

able to pay bills, count change, handle a savings account, and use a checkbook or money orders. He does crafts, goes to the creek to fish, and talks to a friend on the phone. He does not need reminders to go places and does not need anyone to go with him.

When asked if he has problems getting along with family, friends, neighbors or others, plaintiff indicates that sometimes he has problems getting along with his family (Tr. at 145). His condition affects his ability to remember, complete tasks, understand and get along with others. It does not affect any physical abilities or his ability to concentrate or follow instructions (Tr. at 145). He follows written instructions "to the letter" (Tr. at 145). He gets along with authority figures "very well" (tr. at 146).

When asked if he had noticed any unusual behavior or fears, plaintiff indicated nightmares, flashbacks, inability to sleep, lashing out at others, and blacking out (Tr. at 146). He did not mention hearing voices.

**Disability Report**

In an undated Disability Report, plaintiff stated that he can speak and understand English and he can read and understand English (Tr. at 176–86). He suffers from posttraumatic stress disorder, bipolar disorder, schizoaffective disorder, and slipped discs in his back. He stopped working on November 6, 2009,

because he was fired for his temper.  He completed 12th grade in 1999.  At the time he completed this form, he was taking Lisinopril (treats hypertension), Benzatropine,[2] Haloperodol,[3] and Celexa (treats depression).

**School Records**

Plaintiff graduated in 1999 after four years of high school (Tr. at 203).  His GPA was 6.46 out of 11.0.

In a Psychological Report dated November 19, 1996 (while plaintiff was in 10th grade), the school psychologist noted reports by plaintiff's mother that he was abused as a child and that he had "significant heart problems which needs [sic] close monitoring by a physician" (Tr. at 217).  Plaintiff was taking no medication at the time.  He was working and enjoyed his job. Intelligence testing revealed that plaintiff was in the "average range . . . of nonverbal intelligence." (Tr. at 218).  His verbal score was average, and his performance score was low average (Tr. at 218).

*C.  SUMMARY OF MEDICAL RECORDS*

On March 5, 2010, plaintiff was seen at St. Johns' Regional Medical Center by attending physician Tabassum Saba (Tr. at 245–

---

[2]Treats symptoms of Parkinson's disease and tremors caused by other medical problems or psychotic drugs.

[3]Treats schizophrenia, behavior problems, agitation, and symptoms of Tourette's Syndrome.

264, 278-294).  His chief complaint was "Depression.  I cannot handle it anymore."  He had gone to the emergency room reporting visual and auditory hallucinations causing him to be suicidal. Those had been going on for the past two weeks.  He was noted to be "extremely vague" about what the voices were saying. Plaintiff reported being increasingly depressed since the death of his mother and grandmother the year before.  Plaintiff indicated that he denied having any plans to hurt himself and "all in all . . . was rather vague about his symptoms, just stating that he is very depressed."  He stated that he had been off all medication since 2005 (Tr. at 283).

Plaintiff told Dr. Saba that he had been hospitalized in Springfield "2-3 months ago, but could not narrow it down any more than that."[4]  Dr. Saba noted that plaintiff said he lived with friends and had no money, but he reported drinking two to three beers a day and smoking a joint once in a while.

> [P]atient has been hospitalized in the past.  He did state that he has been on disability in the past.  It was stopped in 2005 due to the patient's neglect to fill out paper work. He is trying to get the disability restarted.  He . . . does not have any outpatient psychiatric care and has not been on any medication recently.  He did state that in the past he had been on Prozac and Zoloft [both antidepressants], but no antipsychotics even though he states he started hearing voices at the age of 6 or 7.

---

[4]Because plaintiff did not disclose this Springfield hospitalization in his application, his attorney was contacted about the inconsistency.  Plaintiff "reported that he has never had an inpatient stay in Springfield." (Tr. at 186).

The patient denies that he has any medical problems. . . .
He denies that he has any current legal problems [but] was
hesitant which leads me to suspect that he has had legal
problems in the past.  He states he drinks two to three
beers a day and smokes marijuana and his urine drug screen
was positive for marijuana.

Plaintiff's physical exam was entirely normal, including his

heart.  Plaintiff was observed to have fair hygiene and grooming,

he was polite, he made no eye contact.  "The patient appeared

rehearsed and when asked to describe the voices hesitated."  He

had organized speech with normal rate and tone.  His

insight/judgment was noted to be impaired, affect was flat, mood

was depressed.  He was oriented times four, his short-term memory

was intact, his long-term memory was intact, his concentration

was intact, he had an average fund of knowledge and intelligence

was estimated to be near average.  Plaintiff was noted to have

"supportive friends."

Admitting diagnoses included cannabis abuse, rule out

substance-induced mood disorder, rule out malingering.

During plaintiff's hospital stay, Novella Webster, a

licensed clinical social worker, indicated that plaintiff needed

a psychiatrist and a therapist.  Plaintiff told her that he had

been unable to find work since he was fired for getting into a

fight at work.[5]  Plaintiff participated in psychotherapy groups

_____

[5]This is inconsistent with his testimony that he never
looked for work after he was fired.

14

and showed "much improvement" in his symptoms.

He was discharged on March 9, 2010, with the following

diagnoses:

    Axis I     Possible major depressive disorder with psychotic
                    features
               Marijuana abuse
    Axis II    Personality disorder, not otherwise specified[6]
    Axis III   Moderate stressors
    Axis IV    Financial difficulties, no insurance
    Axis V     GAF on admission 20-25, on discharge 50-55[7]

He was prescribed Haldol (treats mental illness, behavior

problems, agitation), Cogentin (treats side effects caused by

other drugs), Lisinopril (treats hypertension), and Citalopram

(treats depression).  He was directed to use no drugs or alcohol.

Shortly after plaintiff was discharged from the hospital, he

applied for disability benefits.

On June 4, 2010, Stephen Scher, Ph.D., completed a

Psychiatric Review Technique finding that plaintiff's mental

_____

[6]This designation abbreviated NOS can be used when the
mental disorder appears to fall within the larger category but
does not meet the criteria of any specific disorder within that
category.

[7]A global assessment of functioning of 21 to 30 means
behavior is considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment
(e.g., sometimes incoherent, acts grossly inappropriately,
suicidal preoccupation) or inability to function in almost all
areas (e.g., stays in bed all day; no job, home, or friends).  A
global assessment of functioning of 51 to 60 means moderate
symptoms (e.g., flat affect and circumstantial speech, occasional
panic attacks) or moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peers or
co-workers).

impairment (affective disorders, personality disorder, and substance addiction disorders) are not severe (Tr. at 266-276). He found that plaintiff suffers from mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and one or two repeated episodes of decompensation each of extended duration.

In support of his findings, Dr. Scher noted that plaintiff was extremely vague about his complaints of auditory hallucinations, he had been drinking beer and smoking marijuana prior to his hospitalization, he made "absolutely no eye contact" and was noted to appear rehearsed. His orientation, memory, and concentration were intact and he had an average fund of knowledge. He engaged in psychotherapy groups and showed much improvement.

Dr. Scher further noted that plaintiff had reported to the hospital doctor that he had been hospitalized a few months earlier, but when this was followed up on in connection with his disability claim he denied this previous hospitalization. Dr. Scher noted that plaintiff had had no outpatient psychiatric care, his allegations of limitation appear to be exaggerated in comparison to his daily activities, and he was therefore considered not credible.

Dr. Scher noted that there had been "very limited" treatment and that plaintiff was at the time functioning well despite not having yet seen a therapist. "Overall, there is little evidence of severe functional limitations due to a discrete mental impairment alone. These impairments, either singularly or in combination, do not significantly impact on the clt's ability to perform basic work-related activities."

Plaintiff saw Modaser Shah, M.D., on July 6, 2010 (Tr. at 297). Plaintiff told Dr. Shah about his hospitalization from March 5 through 9 due to complaints of auditory and visual hallucinations, suicidal ideation, and dealing with the recent death of his mother and grandmother.

> He was on disability previously and recently this may have been under some [illegible].
> Drinks "2-3 beers a day and smokes a joint once in a while." (Disability stopped in 2005 due to lack of requisite paperwork).

Plaintiff reported that the medications were helping, that his hallucinations were decreasing. The record appears to reflect that plaintiff reported two voices, one telling him to hurt himself and the other counters that. "Some seem like flashbacks." He reported chronic depression since childhood but that it was "somewhat better." Dr. Shah noted that plaintiff "seems to experience anxiety." Plaintiff had no suicidal or homicidal ideation. "Agoraphobia and claustrophobia, mild or moderate, . . . seems genuinely incapacitated."

Dr. Shah did not perform any tests.  He diagnosed the following:

Axis I     R/O [rule out][8] psychotic depression 296.34[9]
           polysubstance abuse

Axis II    P.D. NOS[10]

Axis III   HTN [hypertension]

Axis IV    Financial, losses

Axis V     45[11]

Dr. Shah's "RX" is largely illegible except for, "options, SE [side effects], risks, abstinence, driving".

On September 21, 2010, plaintiff returned to see Dr. Shah (Tr. at 296).  He wrote:

HTN [hypertension] – lisinopril → WNL [within normal limits]
LD Dyslexia[12]

---

[8]In clinical decision-making, to eliminate as a serious diagnostic consideration.

[9]Diagnostic code 296.34 means major depressive disorder, recurrent, severe with psychotic features.

[10]Plaintiff's counsel during the hearing suggested that this stands for "Psychotic Disorder" not otherwise specified.  The two words in parentheses after this notation are not legible.

[11]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[12]Plaintiff's counsel during the hearing suggested that this stands for "learning disability".

Plaintiff reported that he had no energy and was tired, but "doing OK otherwise".  Plaintiff said he was sleeping OK.  "Able to relax a bit and smile."  Most of the record is about plaintiff's disability case:  Under "RX" Dr. Shah wrote, "Medical Source Statement" and an explanation as to why plaintiff lost his last job.

On that day Dr. Shah completed a Medical Source Statement Mental (Tr. at 299-300).  He found that plaintiff is not significantly limited in his ability to ask simple questions or request assistance.  He found that plaintiff is moderately limited in the following:

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to interact appropriately with the general public

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

He found that plaintiff is markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to set realistic goals or make plans independently of others

Dr. Shaw left all of the following abilities unrated:

- The ability to remember locations and work-like procedures

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

Because Dr. Shah's first medical record reflected that plaintiff was using alcohol and marijuana but plaintiff testified at the hearing that he had not used it after his hospitalization and did not know why Dr. Shah wrote that in his record, the ALJ sought clarification from the doctor. Dr. Shah wrote that, "he

was diagnosed with cannabis abuse at Hawthorne Center and I concur [illegible] with the diagnosis. As to how long ago he had cannabis and alcohol, I could not be certain." (Tr. at 303).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge James Harty entered his opinion on April 11, 2011 (Tr. at 13-24). Plaintiff meets the insured status until March 31, 2014 (Tr. at 15).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 15).

Step two. Plaintiff suffers from the following severe impairments: rule out psychotic depression, polysubstance abuse, personality disorder not otherwise specified (schizoid), major depressive disorder with psychotic features, cannabis abuse, major depressive disorder severe with psychotic features, and personality disorder not otherwise specified (Tr. at 15). Plaintiff's hypertension is treated with medication and is not a severe impairment because it results in no reported functional limitations (Tr. at 16). Plaintiff's learning disorder is not a severe impairment (Tr. at 16). He completed high school, has a driver's license, is able to count change and handle a savings account, mental status testing indicated he has an average fund of knowledge and near average range of intelligence (Tr. at 16). Plaintiff's alleged learning disability results in at most a minimal effect on his ability to perform basic work activities

21

and is therefore not severe (Tr. at 16). Plaintiff's claim of
dyslexia is not documented and not supported by testing (Tr. at
16).

Step three. Plaintiff's impairments do not meet or equal a
listed impairment (Tr. at 16–17).

Step four. Plaintiff retains the residual functional
capacity to perform a full range of work at all exertional levels
but with the following nonexertional limitations: He is limited
to simple routine repetitive tasks not performed in a fast–paced
production environment, he can be required to make only simple
work–related decisions, he can be exposed in general to
relatively few work places changes, he is limited to occasional
interaction with supervisors and coworkers, and he must avoid all
interaction with the general public (Tr. at 18). With this
residual functional capacity he can return to his past work as a
machine cleaner or construction worker (Tr. at 22).

Step five. Alternatively, there are other jobs in
significant numbers that plaintiff can perform, such as cleaner,
marker, or document preparer (Tr. at 23).

## VI. *SEVERITY OF ALLEGED LEARNING DISABILITY IMPAIRMENT*

Plaintiff argues that the ALJ erred in finding that
plaintiff does not have a severe impairment due to a learning
disability. Plaintiff relies on his school records and his
testimony that he would be unable to work if people could see

him, that his medications cause him to sleep several hours per day, that he relies on his roommates for rides to the doctor and to remind him of things, and that he gets anxious about doing certain chores.

Plaintiff's argument is without merit.

Once the ALJ finds that a claimant has <u>any</u> severe impairment, he has satisfied the analysis for purposes of step two. His failure to find that additional alleged impairments are also severe is not in itself cause for reversal. See <u>Oldham v. Astrue</u>, 509 F.3d 1254, 1256-1257 (10th Cir. 2007); <u>Maziarz v. Sec'y of Health & Human Servs.</u>, 837 F.2d 240, 244 (6th Cir. 1987). But this does not mean that the omitted impairment simply disappears from his analysis. In determining the claimant's RFC, the ALJ is required to consider the effect of all of the claimant's medically determinable impairments, both those he deems "severe" and those "not severe." See S.S.R. 96-8P. . . .

<u>Hill v. Astrue</u>, 289 Fed. Appx. 289 (10th Cir. 2008).

Here, the ALJ found that plaintiff's alleged learning disability is not a severe impairment. However, he considered plaintiff's alleged learning disorder when formulating the residual functional capacity. He noted that "testing indicates the claimant's intelligence was estimated near the average range" (Tr. at 21). The ALJ specifically noted that Dr. Shah's records -- the only record wherein a learning disorder may have been referred to -- do not support disabling restrictions as "Dr. Shah made assessments in the report that he indicated he had no data to rely on and had performed no testing." (Tr. at 21). The ALJ noted that Dr. Scher's opinion that plaintiff had no severe

mental impairment was given only some weight "as additional
evidence and testimony received at the hearing indicates that the
claimant was more limited than originally thought."

Clearly the ALJ considered all of the mental impairments
that were discussed, and the possibility of a learning disability
was discussed during the administrative hearing (Tr. at 33-34):

> ATTY: . . . Mr. Scolley, based on the medical records
> in the file, . . . has a past of learning disability and
> emotional disability based on the school records . . . .

> ALJ: . . . Now up in the top it says hypertension,
> and then it says LD, which I assume means learning disorder
> although there are no tests, at least by this treating
> source. Then it says dyslexia with no tests. . . . I see
> the following: hypertension; learning disorder, I don't
> know where that comes from; dyslexia, again no test; a rule-
> out diagnosis of psychotic depression. . . .

Because the ALJ found that plaintiff has a severe impairment
and then considered the alleged learning disorder when
formulating the residual functional capacity, his failure to find
that plaintiff suffers from a severe impairment based on a
learning disorder is irrelevant. The fact that the ALJ did not
find that plaintiff's residual functional capacity was limited in
any way due to a learning disorder does not mean he didn't
consider it -- it means he rejected it. In any event, I find
that the ALJ did not err in failing to find that plaintiff's
alleged learning disorder is a severe impairment.

A severe impairment is an impairment or combination of
impairments which significantly limits a claimant's physical or

mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).  The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a)  Non-severe impairment(s).  An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b)  Basic work activities.  When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs.  Examples of these include--

> > (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> > (2)  Capacities for seeing, hearing, and speaking;

> > (3)  Understanding, carrying out, and remembering simple instructions;

> > (4)  Use of judgment;

> > (5)  Responding appropriately to supervision, co-workers and usual work situations; and

> > (6)  Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by his alleged learning disability.

Plaintiff's school records show that when he was in 10th grade, the school psychologist indicated that he was in the

average range of nonverbal intelligence, his verbal score was average, and his performance score was low average.[13]

During the time that these school records were generated, plaintiff was working at a job and he told the school psychologist that he enjoyed his job.

Plaintiff's school records show that he was able to get Bs in math at one time, but an F in math during another semester. He got Bs in physical education, but also got an F in physical education.  This suggests that plaintiff's problem in school (if indeed he had one) was perhaps not based on a learning disability, because he was <u>able</u> to do well in a variety of subjects at various times.  The records also include an order from Juvenile Court stating that plaintiff was required by the court to attend school.  And finally, the records show that plaintiff was enrolled in work study while in high school and earned all As and Bs.

Most of plaintiff's school records are not legible. However, it is clear that according to the school psychologist his verbal and nonverbal intelligence testing produced "average" results, and his performance score was on the low side of

---

[13]The records also indicate that plaintiff's mother had told the school psychologist that plaintiff had "significant heart problems" which needed "close monitoring by a physician"; yet, the only time plaintiff's heart function was ever examined, it was perfectly normal and there are no records of him ever having been treated for any heart condition.

average.  He did well in work study, he was able to work at the substantial gainful activity for several years despite any alleged learning disability, and his adult medical records indicate he had an average fund of knowledge with average intelligence.  There is nothing in the record to suggest that any traumatic event occurred which would change plaintiff's ability to learn.

In addition to having no credible evidence of a learning disorder, plaintiff fails to delineate what basic work activities are affected by it.  He testified that he is not limited in his physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling.  There is no allegation or evidence that he has difficulty with seeing, hearing, or speaking.  He reported in his administrative paperwork that he can follow written instructions "to the letter."  Plaintiff's judgment was noted to be "impaired" when he was at the hospital in March 2010; however, the doctor suspected malingering, noted that plaintiff appeared to be "rehearsed," and there is no question that plaintiff was under the influence of an illegal drug at the time.  He reported in his administrative paperwork that he gets along with authority figures very well. And the fact that plaintiff was able to work at the substantial gainful activity level at more than one job in a several-year

period suggests that he can deal with changes in a routine work setting.

Plaintiff has medical records spanning six and a half months and are comprised of one hospital stay (which was prompted by suicidal thoughts after having used alcohol and an illegal drug), and two visits with a doctor who performed no known tests and even indicated on the Medical Source Statement that he had "no data" and "no testing". Those few medical records include the observations that plaintiff had an average fund of knowledge and was in the average range of intelligence. The Medical Source Statement completed by plaintiff's treating doctor was incomplete as 6 of the 20 functions were unrated. Another doctor formed the opinion that plaintiff's mental impairment is not severe.

The only other support cited by plaintiff for a finding that he suffers from a severe impairment due to a learning disorder is his testimony that he would be unable to work if people could see him, that his medications cause him to sleep several hours per day, that he relies on his roommates for rides to the doctor and to remind him of things, and that he gets anxious about doing certain chores. These statements, even if entirely true, do not provide support for (1) the existence of a learning disorder, or (2) a decreased ability to perform basic work activities due to a learning disorder.

Plaintiff was able to work at the substantial gainful activity level despite any alleged learning disorder. His jobs involved working around people. He was unable to identify anything that he could do before his alleged onset date that he could not do after his alleged onset date. The significance of his alleged onset date is that he was fired that day for a reason wholly unrelated to a problem with learning. Plaintiff participated in group therapy at the hospital and showed rapid improvement. There was no observation by anyone at the hospital of plaintiff having a difficulty being around people during his five-day stay. Plaintiff is able to go out with friends, he goes out daily by driving or riding a bicycle, he goes to the store every day, he is able to go out alone, he does not need others to go with him. All of this was reported by plaintiff in his administrative paperwork. The fact that his testimony directly contradicts what he reported in his application paperwork only suggests that he is not credible.

Plaintiff did not allege that he sleeps for hours every day until his administrative hearing. He never reported this side effect to his doctor, in fact he said that his medications were helping and that he had no energy and was tired, but was doing OK otherwise and was sleeping OK. No one at the hospital noted that plaintiff was drowsy or fell asleep during the day. In his administrative paperwork, plaintiff described his day in such

detail that he noted checking for eggs three times each day.  He did not mention sleeping during the day.  Again, the fact that plaintiff completely changed his allegations during the administrative hearing does nothing more than cast doubt on his credibility.  Furthermore, suffering from drowsiness due to a medication side effect is wholly unrelated to an alleged learning disorder.

Plaintiff testified that he relies on his roommates for rides to the doctor and to remind him of things, but once again this is wholly inconsistent with his statements in his administrative paperwork.  He specifically reported that he does not need reminders to do things or to go places, and he specifically stated that he does not need anyone to go with him.

Finally, plaintiff cites his testimony that he gets anxious about doing certain chores.  Despite alleging anxiety as a disabling impairment, plaintiff could not come up with anything else in his life that causes him anxiety.  He did not identify what chores cause him to be anxious; therefore, it is impossible to use this allegation as evidence that plaintiff has difficulty doing any particular basic work activity.  And again, I fail to see how this is supportive of a learning disorder.

Based on all of the above, I find that the ALJ did not err in failing to find that plaintiff's alleged learning disorder is a severe impairment.

30

## VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in formulating the residual functional capacity because (1) he failed to fully and fairly develop the record by failing to obtain a consultative examination to test plaintiff's IQ, and (2) he gave little weight to the opinions of Dr. Shah and Dr. Scher "therefore leaving only one hospital visit on which to base his RFC analysis."

Consultative examination.  The ALJ is only required to order a consultative examination if the medical records do not provide sufficient evidence to reach a decision.  20 C.F.R. §§ 404.1519a(b) and 416.919a(b); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994).  Plaintiff argues that his school records showing IQ scores "in the 18th percentile and below 70" is enough to require that another IQ test be administered.  This contradicts plaintiff's acknowledgment that "there is a presumption that a person's IQ is the same throughout life absent evidence of a decrease in mental functioning." (plaintiff's reply brief at 2).  Plaintiff further argues that the failure to have an IQ test performed was "particularly harmful because valid updated IQ scores could have proven that Plaintiff may meet or equal listing 12.05(c)."  This argument is without merit.

If plaintiff had IQ scores below 70 and there is a presumption that IQ scores remain stable throughout life, further IQ testing would have accomplished nothing.

The Eighth Circuit has interpreted Listing 12.05C -- mental retardation -- to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).  In addition to these three elements, the claimant must establish deficits in adaptive functioning and that those deficits initially manifest during the developmental period, i.e., before age 22.  Even if plaintiff were to have had another IQ test at the request of the ALJ, the record in this case would not have supported the listing argument.

In Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006), the claimant proved that mental retardation manifested itself before age 22 because he struggled in special education classes through 9th grade and then dropped out of school; had trouble with reading, writing and math; got into frequent fights with other children; and his employment history consisted of only a couple weeks of employment after which he was terminated.  In Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007), the claimant dropped out of school in a low grade and after having been in special education classes.  The court found that the

claimant "likely met his burden of establishing onset before age twenty-two" because he had been unable to read or write, he had been unable to live independently, he was unable to keep jobs because he was slow, and he had a limited work history as a result.

By contrast, in this case plaintiff had some special education classes but has As, Bs and Cs on his transcript; he graduated from high school in the normal four years; he is able to pay bills, count change, handle a savings account, and use a checkbook or money orders; worked at the substantial gainful activity level for several years; never lost a job due to being "slow;" is able to read and write; and although he has roommates is able to care for all of his personal needs as well as do household chores and yard work. Further, the records in this case establish that plaintiff's high school psychologist described him as being intellectually average, he had an average fund of knowledge and was observed to be of average intelligence while in the hospital, and the only record that suggests a learning disability is one which discusses mainly plaintiff's attempt to get his disability benefits going again (i.e., Medical Source Statement and reasons for losing his last job) rather than any learning difficulties, and the "discussion" of a learning disorder in the medical record consists of nothing more than the initials "L" and "D".

There was no reason to order a consultative exam, and even if one had been ordered and had resulted in a low IQ score, plaintiff would still not be entitled to disability benefits on that basis.

Opinions of Dr. Shah and Dr. Scher. Plaintiff argues that the ALJ improperly discounted these opinions thereby leaving only the hospital records to support the residual functional capacity assessment. The record does not support such an assertion.

First, the opinion of Dr. Shah was properly discounted. A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). In determining the weight to give to a medical opinion, the ALJ considers a number of factors including the examining relationship, the length of the treating relationship, the frequency of examination, whether the opinion is supportable and consistent with the record as a whole, and whether the opinion is from a specialist about an issue related to that specialty. 20 C.F.R. §§ 404.1527(c) and 416.927(c). Under the regulations, treating physicians' opinions are generally entitled to greater weight than consultative opinions, which generally receive greater weight than opinions of

non-examining physicians. 20 C.F.R. §§ 404.1527(c) and 416.927(c).

Here plaintiff saw Dr. Shah on two occasions over a three-month period. His opinion in the Medical Source Statement is not consistent with plaintiff's own statements to the hospital staff or in his administrative paperwork which was completed shortly before he saw Dr. Shah for the first time. But most importantly, the opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques. No testing was done. No observations were noted which would be consistent with his findings in the Medical Source Statement.

Dr. Shah found that plaintiff was moderately limited in his ability to adhere to basic standards of neatness and cleanliness; however, plaintiff was never observed to be unclean. He found that plaintiff is markedly limited in his ability to understand, remember and carry out detailed instructions, but plaintiff reported that he could follow written instructions "to the letter." He found that plaintiff was markedly limited in his ability to concentrate, but just a couple months earlier plaintiff was hospitalized and observed to have no difficulty with concentration. He found that plaintiff was markedly limited in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms; but he never noted any psychologically based symptoms in his medical records.

He failed to rate many of the abilities in the Medical Source
Statement, he completed it during plaintiff's second and final
visit, and he noted on the form that he had "no tests" and "no
data."  The ALJ properly discounted this opinion.

Although plaintiff argues that the ALJ erred in discounting
the opinion of Dr. Scher, this is somewhat surprising since Dr.
Scher found that plaintiff had no severe mental impairment.  The
ALJ did not ignore the opinion, he merely gave it less weight
because of the "other evidence" including the testimony at the
hearing.

The ALJ considered all of the credible evidence before
assessing plaintiff's residual functional capacity.  That
evidence includes the following:  Plaintiff did not mention
sleeping during the day until the administrative hearing and even
told his doctor shortly before the hearing that he was "sleeping
OK."  He denied needing reminders until the administrative
hearing and then he changed his testimony.  He denied needing
anyone to go with him when he goes out, until he testified to the
contrary.  He never mentioned hearing voices in any of his
administrative paperwork, even when he was asked about unusual
behavior or fears.  He told hospital personnel that he began
hearing voices two weeks before, which was months after his
alleged onset date.  He told the hospital that he was trying to
get disability benefits and also said he had been hospitalized in

Springfield a couple months earlier but admitted later to
Disability Determinations that he had not in fact been
hospitalized in Springfield or anywhere else prior to his stay at
St. John's.  While he was at the hospital, his short-term memory
was intact, his long-term memory was intact, his concentration
was intact, he had an average fund of knowledge and his
intelligence was estimated to be near average.  This is despite
having taken illegal drugs and not having been on any
prescription medications at the time.  He told the doctor at the
hospital that he had not been able to find work since he was
fired, but in reality he had not even looked for work.  He
participated in groups at the hospital with success, and no
problems with interactions were noted.  Plaintiff never saw a
therapist after he was discharged from the hospital despite
having been told he should do that.  He did not see a
psychiatrist until after his medications ran out, and he reported
to that psychiatrist that his medications were helping.  He told
his psychiatrist that other than lack of energy and feeling
tired, he was doing OK and that he was sleeping OK.  His school
psychologist stated that his intellectual functioning was
average.  He earned good grades and failing grades in the same
subjects, which indicates that he was capable of doing well in
school.  He testified that if he could not see his co-workers, he
probably would have no problem performing a job.

The residual functional capacity assessment adequately took into account all of the credible evidence, and the ALJ did not err in determining what weight to give to the medical opinions.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 9, 2014